```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                       Docket #1:21-cv-07052-
 FIRST LOOK INSTITUTE, INC., et al., :  BCM

                      Plaintiffs,  :

  - against -                      :

 U.S. IMMIGRATION AND CUSTOMS      : New York, New York
 ENFORCEMENT,                        December 7, 2021
                                   :
                      Defendant.     STATUS CONFERENCE
------------------------------------- :


                      PROCEEDINGS BEFORE
                 THE HONORABLE BARBARA C. MOSES,
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:        EMERY CELLI BRINCKERHOFF ABADY WARD &
                       MAAZEL LLP - NEW YORK
                       BY:  DEBRA LEA GREENBERGER, ESQ.
                       600 Fifth Avenue - 10th Floor
                       New York, New York 10020

                       VICTORIA J. NOBLE, ESQ.
                       Pro Hac Vice
                       (Appearing telephonically)

For Defendants:        UNITED STATES ATTORNEY'S OFFICE
                       SOUTHERN DISTRICT OF NEW YORK
                       BY:  ALLISON ROVNER, ESQ.
                       86 Chambers Street
                       New York, New York 10007



Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|

None

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|

None

THE COURT OFFICER:  First Look Institute, Inc. et al versus U.S. Immigration and Customs Enforcement, Docket Number 21-civ-7052.

Counsel, please state your appearance for the record.

MS. DEBRA L. GREENBERGER:  Debra Greenberger, Emery Celli Brinckerhoff Abady Ward & Maazel, for the plaintiffs. Good morning, your Honor.

HONORABLE BARBARA C. MOSES (THE COURT):  Good morning, Ms. Greenberger.  You may both be seated.

MS. ALLISON ROVNER:  Good morning.  AUSA Allison Rovner for defendants.

THE COURT:  Good morning, Ms. Rovner.

Do we also have an attorney on the phone?

MS. VICTORIA J. NOBLE:  Yes.  This is Victoria Noble for First Look Institute and Travis Mannon.

THE COURT:  Good morning, Ms. Noble.  So I think that's everybody; Ms. Noble and Ms. Greenberger for the plaintiff, and Ms. Rovner for the government.

Before we get to the question of the timing of the production of the 59-minute video, let me ask a couple of background questions to that I better understand the case. Ms. Greenberger, do I understand properly that the original FOIA request was made, I guess, one year and 11 months ago

now, January of 2020; is that correct?

MS. GREENBERGER:  That is correct, although we're in December, your Honor, so a little more than 11 months; but, yes, nearly two years ago.

THE COURT:  Well, it's not December 14th yet.

MS. GREENBERGER:  Fair enough.

THE COURT:  All right, so almost two years.  And after first saying that they had not found any responsive records, ICE ultimately found a single 59-minute video. Your joint letter dated October 19th suggests that there are or that there may be two additional videos.  What makes you say that?

MS. GREENBERGER:  There was some evidence in the underlying proceedings that happened in Texas that there was multiple videos.  But I don't know any more about that; ICE has only told us about one video.

THE COURT:  Well, expand on that a little bit, if you would.  What were the underlying proceedings in Texas?

MS. GREENBERGER:  Can I actually defer to Ms. Noble on that?

THE COURT:  Ms. Noble, go ahead.

MS. NOBLE:  Thank you.

The underlying procedures were a court, emergency court hearing to authorize ICE to continue feeding

Mr. Kumar.  There was (indiscernible) of testimony

Mr. Kumar gave and also from his doctors that discussed two

failed attempts to insert a nasogastric tube and then one

successful attempt.  We have information from Mr. Kumar

that there were three procedures, and also we have

videotapes.  Since we don't have the video, we haven't

viewed the video, we don't know if all of these procedures

happened at one time and they're all included in the same

video or if ICE is in the same two videos.  We do know from

the records that were produced in Texas that between these

procedures there were pauses to conduct or to take extra

pictures and do other kind of other medical examinations

that may not have been sealed.  We just don't know.

THE COURT:  The forced feeding occurred in August

and early September 2019, is that correct?

MS. NOBLE:  The feeding in Texas?

THE COURT:  The forced feeding.

MS. NOBLE:  May I please check my records?  I

don't actually know the date off the top of my head.

MS. GREENBERGER:  I can answer that.  That is

correct, your Honor.

THE COURT:  And that took place in an ICE

detention center in Texas?

MS. GREENBERGER:  Correct.

1

2          THE COURT:  All right, and then these legal

3   proceedings, which also took place in Texas, they took

4   place in what court in Texas?

5          MS. GREENBERGER:  The court -- I can answer that.

6          MS. NOBLE:  One moment, please.  It was a federal

7   district court.  I will pull up the file.

8          THE COURT:  And the purpose of these legal

9   proceedings -- and this was obviously not a FOIA action --

10  this was a dispute over the legality of and/or the

11  conditions under which the forced feeding occurred -- I'm

12  guessing here?

13         MS. NOBLE:  Yes.  ICE is required to go to court

14  and get an order to perform these involuntary procedures.

15         THE COURT:  And Mr. Kumar had counsel at that time

16  that was not your firm, is that right?

17         MS. NOBLE:  Yes.

18         THE COURT:  Okay.  And I think what you're saying

19  is you think there may have been more than one video

20  because Mr. Kumar indicated that he was videotaped more

21  than once.

22         MS. NOBLE:  He indicated that he was videotaped in

23  all three procedures.

24         THE COURT:  And those three procedures occurred on

25  different days?

MS. NOBLE:  That, I don't know.  I believe they may have been on the same day, but they were separated by trips to the X-ray machine.

THE COURT:  Okay.  I would have assumed this information was in the records of the Texas proceeding, no?

MS. NOBLE:  I will look.  I have a copy of a hearing transcript.  I don't have all of the medical records; I have some of the medical records.

THE COURT:  Okay.  And where is Mr. Kumar now?

MS. NOBLE:  He was staying with, I believe, a friend.  I actually don't have full information about that. I don't want to speak --

THE COURT:  All right, so he's no longer detained, is that correct?

MS. NOBLE:  Yes.  He's been released from detention.

THE COURT:  All right, and is he working with the First Look Institute on this FOIA matter, or are you operating independently?

MS. NOBLE:  We're operating independently, but we have our reporter (indiscernible).  Travis Mannon has spoken with the person he's staying with.  And we also have a signed privacy waiver from Mr. Kumar that was witnessed by the same person.

1

2          THE COURT:  Okay.  All right.  So let us turn,

3   then, to the matter at hand.  Because this is a FOIA case,

4   I will not be issuing a traditional pretrial scheduling

5   order with discovery deadlines and so forth.  But I do have

6   some supervisory responsibility, now that the matter is in

7   federal court, over the schedule by which the government

8   proposes to release the one video that the government has

9   agreed to release.

10         So, Ms. Rovner, I am not a videographer nor a

11  software engineer, and I am not familiar with the Freedom

12  Labs software that the government uses, but my common

13  sense, not to mention my considerably younger and more

14  technologically savvy children, tell me that the schedule

15  that the government proposes boggles the mind.  Can you

16  explain it to me?

17         MS. ROVNER:  Sure, your Honor.  So the schedule

18  the government proposes is producing five-minute segments

19  of the 59-minute video per month over 12 months.  And

20  that's for a couple of reasons.  The first is what the

21  government explained in the letter about issues encountered

22  with processing the video.  The most significant -- the

23  government's encountered or ICE FOIA has encountered

24  technical issues since it started processing, including

25  needed to be trained in how to use this Visual Lab software

--

THE COURT:  Has that now happened?  Are the
appropriate personnel now trained?

MS. ROVNER:  Yes, that has happened.  And they
also encountered issues importing the video into the
software.  But they've broken it up into segments and have
the video in the software.

THE COURT:  What do you mean "importing the video
into the software"?  I would think that -- correct me if
I'm wrong here -- if the purpose of this software is to
enable people to edit video, the software has to be capable
of allowing the importation of the video to be edited.  I
mean, isn't that like, I don't know, opening the door to
the car and getting into it?

MS. ROVNER:  I don't -- I'm not -- I'm also not a
technical expert, but I understand that they had issues
importing the video into the software.  They had to get
Visual Lab's help with that.  And contrary to what
plaintiffs said in their letter, the entire 59-minute video
cannot be imported in the software at once; it needed to be
broken into smaller segments.  I don't know -- because the
original proposal was 15-minute segments, I don't know
whether a 15-minute segment was small enough to import into
the software, but the video has been imported into the

1  software.

2         And then ICE FOIA encountered difficulties.  They

3  tried using that automatic redaction tool that plaintiffs

4  pointed out, and --

5         THE COURT:  That's the thing which theoretically

6  would blur everybody's faces all at once?

7         MS. ROVNER:  Yes.  And it didn't work perfectly to

8  do that or didn't even work well to do that.  So in a five-

9  minute segment there are 9,000 frames.  And ICE FOIA had to

10 go through each of the 9,000 frames and make sure that the

11 blurring was correct.  And it often wasn't, which required

12 in each of those 9,000 frames for redactions to be

13 inserted.  And it's not just faces; it's also -- there's

14 some ICE e-badges on the officers that have their names

15 that need to be redacted.  So ICE FOIA had to add

16 redactions, sometimes remove redactions.  But it required

17 review of each of the 9,000 frames, which was a tedious

18 process.

19        They also encountered technical issues, which I

20 assume one would think that they wouldn't encounter with

21 saving the redactions.  So it took much longer than

22 anticipated, which is why the government revised its

23 proposal from 15 minutes per month over four months to five

24 minutes per month over 12 months.

So those were the technical issues.  There's also
resource issues with the volume of FOIA requests that ICE
is receiving.  They've seen a substantial increase in FOIA
requests beginning in 2018.  For example, in 2015 they
received a little over 44,000 FOIA requests; by 2021,
they've received over 106,000 FOIA requests.  So from 2017
to --

THE COURT:  Hold one moment, please, Ms. Rovner.
Proceed.

MS. ROVNER:  So from 2017 to 2020, ICE had seen a
240% increase in the number of FOIA requests.  They're
currently processing 5,000 open FOIA requests, which
includes a backlog of 4,600 requests.  And a backlog means
the request has been pending for more than 20 days.  ICE
FOIA currently has 146 open federal district court cases,
with 60 cases in active record production.  As far as
staffing, there are 18 FOIA specialists processing the
requests at the administrative level and four specialists
plus one supervisor processing the requests in litigation.

And ICE handles the FOIA requests in a first-
in/first-out basis to ensure fairness among the requesters
and litigants.  And most cases involve actually documents
and records rather than videos, and for that the normal
processing rate is 500 pages per month.  I don't know how

that equates to 9,000 frames in a video, but that's the

information I have on the processing rate.  So ICE has

these resource issues and tries to handle them in a fair

manner by processing in a first-in/first-out basis.

And, if your Honor would allow, I'd like to

respond to a couple of points in plaintiffs' letter about

what they are suggesting in their reply letter.

THE COURT:  Let me ask you a couple of questions

first, if you don't mind.  The five minutes per month that

you now propose, which is 9,000 frames, what does that

equate to in terms of person hours?

MS. ROVNER:  That I don't have an exact number.  I

asked, and it wasn't recorded because there was an amount

of time that was spent redacting and then there was

additional time spent with all the technical issues.  But

there is --

THE COURT:  But that, if I understand it

correctly, is past.  The startup investment of time, both

in getting trained on this Visual Art software and in

overcoming whatever the original importation barriers were,

you tell me that that's done.  The personnel are trained

and the video has been imported.  So going forward, it's

just the marginal time, so to speak, of how many frames can

your available technicians get through per hour or per day,

1

2   as the case may be.  That's got to be crucial information

3   because if it turns out that one person can get through

4   9,000 frames, which is what you tell me a five-minute

5   segment is, in three and a half hours, that's one thing.

6   If it takes three technicians all day every day for a

7   month, that's another thing.  That's important information.

8          MS. ROVNER:  So we don't have that for the -- ICE

9   did produce the first segment on November 19th.

10          THE COURT:  Okay.

11          MS. ROVNER:  And we don't have that information

12  for that month because they encountered so many technical

13  issues, including with saving the redactions they'd done.

14  So they had to go back and redo redactions.

15          THE COURT:  Have they now learned how to save

16  their redactions?

17          MS. ROVNER:  I'm not sure whether they're still

18  encountering issues with that.

19          THE COURT:  Well, presumably, they eventually

20  learned how to save their redactions, because they would

21  have to be saved on the segment that was turned over.

22          MS. ROVNER:  Eventually with -- you're correct

23  with that first five-minute video.  They encountered

24  issues, so had to redo their work and eventually could save

25  the redactions, and that video was produced on

November 19th.

THE COURT:  All right.  And let me ask -- I don't
know if it's Ms. Noble or Ms. Greenberger --  you have it?
It is satisfactory?

MS. GREENBERGER:  We have it.  It is one -- you
know, I'm concerned to hear that it's been broken up into
segments.  But it is satisfactory except that we are
reserving our right to challenge the exemption.  All the
faces are blurred, sometimes unnecessarily so, it seems to
me.  But it is -- it runs, we can watch it, yes.

THE COURT:  It runs, you can watch it.  It shows
Mr. Kumar --

MS. GREENBERGER:  Yes.

THE COURT:  -- unredacted because he signed a
waiver?

MS. GREENBERGER:  Correct, your Honor.

THE COURT:  And it shows people around him with
their faces and their badges blurred, generally speaking?

MS. GREENBERGER:  Correct, your Honor.

THE COURT:  Okay.  All right, so, really, the only
question here is the plaintiff says five minutes a month is
nonsense, the government says five minutes a month is the
best we can do realistically.  But the government has not
provided me with what I think the most important data is to

evaluate the government's position.  So what should I do,

Ms. Greenberger?

MS. GREENBERGER:  You know, my position, what
we've seen from the government is that when there are
court-ordered deadlines, then the government meets those
deadlines.  And part of the reason that this has become so
much work is that when we made the simple request, you
know, January 2020, they didn't comply with it.  We had to
come to your Honor, which never should have happened in the
first place.  And so I think if we set a schedule where
they have to produce it in a month or six weeks, they'll
meet that schedule and they'll find the resources to do
that.

THE COURT:  Ms. Rovner?

MS. ROVNER:  Your Honor, as explained in the
government's letter, there's -- one of the, I guess, four
specialists in the litigation processing unit is assigned
to process this video, and she also has a number of other
federal court cases which --

THE COURT:  Involving videos?

MS. ROVNER:  Involving records.  I don't know that
they're videos.  And she's had to request overtime to even
complete all of her work on the case.  So I think if the
Court issues an order that requires the videos to be

1
2 processed more quickly than five minutes per month, I can't
3 say whether that's possible or not possible, but it will
4 require, I guess, this case to kind of jump the line in
5 front of other cases that have been pending for longer.
6          THE COURT:  Well, how do I know that, Ms. Rovner?
7 I understand the concept, certainly, but I have not been
8 provided with any information except the overview that
9 you've given me orally this morning.  I certainly don't
10 have any evidence as to how many cases are out there and
11 how you have triaged them, which FOIA case came in first,
12 which federal Complaint was filed first, what the volume of
13 these various requests are.  And I don't know -- I'm not
14 volunteering for that job, for that job of receiving that
15 information and sorting through to determine whether ICE is
16 sequencing its FOIA requests fairly or unfairly, given
17 limited resources and increasing demands.
18          But I am responsible for making sure that the FOIA
19 request at issue in this case is addressed reasonably
20 promptly.  And when I say "reasonably promptly," I mean
21 reasonably promptly pursuant to the significantly
22 diminished expectations that we are all now living with in
23 FOIA cases, which bear very little resemblance to what I
24 think Congress contemplated when it originally passed the
25 statute.  But I don't want to degrade the process even

further.  I have not heard anything this morning that

convinces me that five minutes per month is the best that

the government can or should be asked to do.  That said,

this isn't an emergency case in the sense that the world --

well, maybe the world is waiting breathlessly for the full

59 minutes, but not for any specific goal or deadline that

I am aware of.  So what I'm inclined to do here is I am

inclined to split the baby and make both of you unhappy and

require that the original proposal -- and by "original," I

mean in October of this year -- was to produce the entire

video in four equal segments.  And let me see what your

time period was for that at the time.  Who wants to remind

me what the government's time period was?

MS. GREENBERGER:  Your Honor --

THE COURT:  Ah, November, December, January, and

February.  The December deadline is coming up.  And in the

December deadline I think you now contemplate producing

just five minutes, is that right?

MS. ROVNER:  Yes, your Honor, and I've reminded

ICE of that deadline.  And the last I heard, they're on

track to do five minutes by December 20th.  I don't know --

THE COURT:  Five minutes by December 20th?

MS. ROVNER:  I don't know whether -- I think it

would be difficult if your Honor is inclined to have them

1

2  produce 15 minutes, for them to do that by December 20th.

3          THE COURT:  It may not be possible.  So let's do

4  this.  Five minutes by December 20th.  And then you only

5  get three months after that.  So one-third of the remaining

6  video by January 19th.  Let's see if I can do that math in

7  my head.  I think that would be 30%.  Right?  Five percent

8  in November, five percent in December.  That gets us up to

9  ten.  So 30% January 19th, 30% February 18th, and 30%

10 March -- I don't have my calendar up.  Is March the 18th a

11 weekday?  March 18th is a Friday.  All right, so the final

12 30% on March 18th.

13          And, Ms. Rovner, if the government determines that

14 that is impossible, what we will do is we will have an

15 evidentiary hearing on that point on a convenient date in

16 January, at which you will produce someone from ICE who can

17 provide admissible testimony as to why it's impossible.

18 Hopefully, we won't get to that point, but let me give you

19 a deadline of December 20, which is your deadline for

20 producing the next five minutes, to advise me by letter if

21 the government contends that it cannot then go to the

22 schedule that I outlined for you to produce larger segments

23 in January, February and March.  And if I receive that

24 letter on or before December the 20th, then we'll schedule

25 an evidentiary hearing for a not-too-inconvenient date in

January.

In the hope that that is not necessary, I think I should also put a status calendar -- a status conference on the calendar for the end of March or the beginning of April, just to check in and see what is going on and if and when there are going to be summary judgment motions or perhaps not.  April the 7th, then.  Mr. Snell tells me I'm available at ten o'clock in the morning, presumptively here in Courtroom 20A, public health conditions permitting.  And I will ask for a joint status update letter one week prior, please.

All right, anything further for today, Ms. Greenberger?

MS. GREENBERGER:  Yes, your Honor.  So I just also want to come back to this issue of the segmenting.  And so on December 20th are we going to be getting minutes five through ten or minutes zero, one through ten?

THE COURT:  I don't know.

Ms. Rovner?

MS. ROVNER:  It will be five through ten.

THE COURT:  All right, so you're going to end up with lots of little, short videos, and you're going to have to put them together yourself, it sounds like.

MS. GREENBERGER:  Right.  And so I think it's

going to be important to us to make sure that there is no

frames that get lost, so that we're able to piece them

together.  And I don't know if the best approach is to try

to hammer that out now or for Ms. Rovner and I to try to

hammer out a protocol and approach the Court only if

there's a dispute on that.

THE COURT:  Well, I confess that this was a

problem I did not envision.  I am assuming, but perhaps it

would be helpful to say it out loud, Ms. Rovner, that there

will be no gaps, that video number two will pick up at the

very next frame where video number one left off?

MS. ROVNER:  Yes, your Honor, I think that's the

plan.  And each production is accompanied by a production

letter.  I know plaintiffs mentioned they were concerned

about authenticity issues, but each segment will be

accompanied by a production letter from ICE saying what

segment it is.

THE COURT:  Okay.  So perhaps the best way to

leave that, then, is to just make sure that that production

letter provides plaintiffs' counsel with the necessary

information so that they can assure themselves that there

are no gaps in the production.

Anything else, Ms. Greenberger?

MS. GREENBERGER:  No.  And I'll consult with our

1

2  client, who's a videographer, about what that necessary

3  information would be, and I'll get that to Ms. Rovner.

4         THE COURT:  All right, and your individual client,

5  Mr. Mannon, he understands this software?

6         MS. GREENBERGER:  Correct, yes.

7         THE COURT:  Okay.  Anything further, Ms. Rovner?

8         MS. ROVNER:  No, your Honor.

9         THE COURT:  All right.  Thank you very much,

10  counsel.

11         (Whereupon, the matter is adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the case of First Look
Institute, Inc. et al v. U.S. Immigration and Customs
Enforcement, Docket #21-cv-07052-BCM, was prepared using
digital transcription software and is a true and accurate
record of the proceedings.

Signature_____*Carole Ludwig*_____

                    Carole Ludwig

Date:     December 21, 2021